**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| PATRICIA GOODMAN, derivatively on behalf of ABBOTT LABORATORIES, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) CASE NO: |
| | ) _____ |
| MILES D. WHITE, ROBERT J. ALPERN, M.D., ROXANNE S. AUSTIN, W. JAMES FARRELL, H. LAURANCE FULLER, EDWARD M. LIDDY, PHEBE N. NOVAKOVIC, WILLIAM A. OSBORN, SAMUEL C. SCOTT III, GLENN F. TILTON, K. FRANK AUSTEN, M.D., DUANE L. BURNHAM, PAUL N. CLARK, WILLIAM M. DALEY, RICHARD A. GONZALEZ, JACK M. GREENBERG, THOMAS R. HODGSON, DAVID A. JONES, JEFFREY M. LEIDEN, M.D., PH.D., THE RT. HON. LORD DAVID OWEN CH, ROBERT L. PARKINSON, JR., BOONE POWELL, JR., ADDISON BARRY RAND, W. ANN REYNOLDS, PH.D., ROY S. ROBERTS, WILLIAM D. SMITHBURG, JOHN R. WALTER, and WILLIAM L. WEISS, | ) ) ) ) ) ) ) ) ) ) ) **JURY TRIAL** ) **DEMANDED** ) ) ) ) ) ) ) |
| Defendants, | ) ) |
| -and- | ) ) |
| ABBOTT LABORATORIES, | ) ) |
| Nominal Defendant. | ) ) ) ) |

<u>**VERIFIED SHARHOLDER DERIVATIVE COMPLAINT**</u>

For Plaintiff Patricia Goodman's ("Plaintiff") Verified Shareholder Derivative

Complaint, Plaintiff alleges the following upon personal knowledge as to herself, and upon

information and belief as to all other allegations, based upon her attorneys' investigation of information pertinent to the claims herein alleged:[1]

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought pursuant to Federal Rule of Civil Procedure 23.1 on behalf of nominal defendant Abbott Laboratories ("Abbott" or the "Company"), against the current members of the Company's Board of Directors (the "Board") and certain former directors and officers of Abbott.  Plaintiff seeks injunctive and other relief against defendants for breaches of fiduciary duties owed to Abbott arising out of the Company's illegal off-label marketing of the drug Depakote.  These breaches of fiduciary duties have substantially injured and will continue to substantially injure the Company.

2.      Abbott is a broad-based health care company that discovers, develops, manufactures, and markets products and services that span from prevention and diagnosis to treatment and cure.  Abbott's principal businesses are pharmaceuticals, nutritional and medical products, including diagnostics and cardiovascular devices.

3.      According to Abbott's website, the drugs Depakote (divalproex sodium delayed-release tablets) and Depakote ER (divalproex sodium extended-release tablets) are used to treat acute manic episodes associated with bipolar disorder, and to prevent migraine headaches in adults.  Moreover, Depakote, Depakote ER, and Depakote Sprinkle Capsules (divalproex sodium coated particles in capsules), when taken alone or with other seizure medications, are used to treat seizure disorders in adults and children ten years of age and older, and the seizure disorders need to include complex partial seizures or simple and/or complex absence seizures.

---

[1]  Plaintiff has principally derived the facts alleged herein from sources including United States Securities and Exchange Commission ("SEC") filings, newspaper articles, websites, including that of the Food and Drug Administration ("FDA"), and the Amended Complaint filed in *United States ex rel. McCoyd v. Abbott Laboratories*, No. 1:07-cv-00081-SGW (W.D. Va.) (the "*qui tam* Amended Complaint").

4.      As current or past directors and/or officers of Abbott, each of the Director Defendants (as defined herein) owe and have owed Abbott and its shareholders the fiduciary duties of loyalty and due care in the management and administration of the Company's affairs. As more fully described herein, the Director Defendants caused and/or allowed Abbott to knowingly engage in repeated and persistent violations of federal regulations.  For over a decade, Abbott marketed Depakote, Depakote ER, and Depakote Sprinkle Capsules for uses not approved by the FDA, or "off-label" uses, in violation of applicable law.

5.      Beginning in or around 1998, Abbott took substantial measures to market the drugs for off-label uses, specifically targeting, among others, elderly patients suffering from Alzheimer's disease or dementia, and children.  As a result of the off-label marketing of Depakote, Abbott and the Director Defendants have profited substantially, with the Company making billions of dollars as a result.

6.      Due to the improper off-label marketing of Depakote, Abbott has tentatively agreed to pay at least $1.3 billion to settle claims by the United States government and twenty-four states.  The tentative agreement reached among Abbott executives, federal prosecutors, and state officials will require Abbott to pay approximately $800 million to resolve civil claims and approximately $500 million in criminal penalties.  As alleged herein, the Director Defendants' sustained action and/or failure to act to protect the Company in the face of systematic violations of applicable law resulting from the off-label marketing of Depakote has resulted in what is to be the *third largest settlement* for illegal pharmaceutical marketing in United States history.

7.      On October 19, 2011, Abbott announced that it had reserved $1.5 billion "related to ongoing settlement discussions in the previously disclosed investigation by the U.S.

Department of Justice, through the U.S. Attorney for the Western District of Virginia, related to Depakote."

8.     As detailed herein, current and former directors and/or officers of the Company caused and/or allowed Abbott to off-label market Depakote for a substantial period of time, despite knowing that Abbott was violating the law and could face substantial monetary fines and criminal liability in connection with its misconduct.  The wrongdoing detailed herein was not misconduct perpetrated at the bottom levels of the Company hidden from the view of senior managers and directors.  The Director Defendants' actions (and inaction) were serious and substantial violations of their fiduciary duties to the Company's shareholders.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this action under and pursuant to 28 U.S.C. § 1332(a) because this action is an action for, *inter alia,* damages in excess of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship.

10.     This action is not a collusive one to confer jurisdiction on a Court of the United States that it would not otherwise have.

11.     Venue is proper in this District because Abbott is incorporated in this District and headquartered here.

## THE PARTIES

12.     Plaintiff currently owns shares of Abbott common stock, and has continuously owned shares in Abbott at all times relevant to this action.  Plaintiff brings this action derivatively in the right and for the benefit of Abbott.  Plaintiff will fairly and adequately represent the interests of Abbott and its shareholders in enforcing the rights of the Company. Plaintiff is a citizen of Florida.

13.     Nominal defendant Abbott is a citizen of Illinois.   Abbott is an   Illinois corporation headquartered in Chicago, Illinois.   As alleged above, Abbott discovers, develops, manufactures, and markets products and services that span from prevention and diagnosis to treatment and cure.   Abbott's principal businesses are global pharmaceuticals, nutritional and medical products, including diagnostics and cardiovascular devices.   Abbott manufactures and markets Depakote, Depakote ER, and Depakote Sprinkle Capsules, the manufacture of which is governed by federal law and regulation, and many of its activities are regulated by the FDA. Abbott's common shares are traded on the New York Stock Exchange, and shares are also listed on the Chicago Stock Exchange and are traded on various regional and electronic exchanges. Abbott's shares are also listed on the London Stock Exchange and Swiss Stock Exchange.

## The Director Defendants

### Current Director Defendants

14.     Defendant Miles D. White ("White") has been a director of the Company since April 1998 and has served as Chairman of the Board since 2000.   White was elected Executive Vice President on February 13, 1990, and elected Chief Executive Officer ("CEO") in January 1999.

15.     Defendant Robert J. Alpern, M.D. ("Alpern") has served on the Company's Board since October 2008.   Alpern has been a member of the Public Policy Committee since April 2010.

16.     Defendant Roxanne S. Austin ("Austin") has served as an Abbott director since December 2000.   Austin has served on the Audit Committee since April 2001 and as Chairman since April 2007.   She has also served on the Public Policy Committee since April 2003.

17.     Defendant W. James Farrell ("Farrell") has served on the Company's Board since January 2006.  Farrell has been a member of the Compensation Committee and Nominations and Governance Committee since April 2006.

18.     Defendant H. Laurance Fuller ("Fuller") has been a director of Abbott since 1988. Since joining the Company, Fuller has served on: the Compensation Committee, and was the Chairman from April 1997 until April 2003; the Board Affairs Committee until April 1997; and the Nominations and Governance Committee as Chairman since April 2003.

19.     Defendant Edward M. Liddy ("Liddy") has been an Abbott director since June 2010 and has served on the Audit and Compensation Committees since June 2010.

20.     Defendant Phebe N. Novakovic ("Novakovic") has served as an Abbott director since June 2010.  Novakovic has been a member of the Nominations and Governance Committee and Public Policy Committee since June 2010.

21.     Defendant William A. Osborn ("Osborn") has been a director of Abbott since January 2008.  Osborn has served on the Compensation Committee since April 2008 and the Nominations and Governance Committee since April 2010.

22.     Defendant Samuel C. Scott, III ("Scott") has been a director of the Company since April 2007.  Scott has also been a member of the Audit Committee since April 2007.

23.     Defendant Glenn F. Tilton ("Tilton") has served as an Abbott director since April 2007.  Tilton has served on the Audit Committee since April 2007.

24.     The defendants referred to in paragraphs 14 through 23 are collectively referred to hereinafter as the "Current Director Defendants."

**Former Director Defendants**

25.     Defendant K. Frank Austen, M.D. ("Austen") was an Abbott director from 1983 until his retirement in April 1999. Austen served as a member of the Nominations Committee and Board Affairs Committee until April 1996, the Board Affairs Committee in April 1998, and the Audit Committee from April 1997 until April 1998. Austen is also a director of Humana Inc., along with Reynolds (defined below), and which Jones (defined below) co-founded.

26.     Defendant Duane L. Burnham ("Burnham") served as a director of the Company from 1985 and was the Chairman of the Board and CEO until his retirement in January 1999. Burnham was elected CEO in 1989 and Chairman in 1990.

27.     Defendant Paul N. Clark ("Clark") was a director of the Company from April 1998 until December 1998.

28.     Defendant William M. Daley ("Daley") served as an Abbott director from April 2004 until January 2011. While at the Company, Daley served on the Compensation Committee from April 2004 until January 2011 and the Public Policy Committee from April 2005 until January 2011.

29.     Defendant Richard A. Gonzalez ("Gonzalez") was a director of Abbott from 2001 until his retirement in September 2007. Gonzalez was also the President and Chief Operating Officer ("COO") of the Company until he retired in 2007.

30.     Defendant Jack M. Greenberg ("Greenberg") served as an Abbott director from December 2000 until his retirement in April 2006. During his time at the Company, Greenberg served on the Compensation Committee in April 2000, the Nominations and Board Affairs Committee from April 2001 until April 2003, and was Chairman of the Audit Committee from April 2003 until his retirement.

31.     Defendant Thomas R. Hodgson ("Hodgson") was a director of the Company since 1985 and served as President and COO from 1990 until December 1998.

32.     Defendant David A. Jones ("Jones") served as an Abbott director from 1982 until his retirement in April 2003.  During his time at the Company, Jones was a member of: the Nominations Committee until April 1997; the Board Affairs Committee until April 1997; the Audit Committee from April 1997 until April 2004; and the Public Policy Committee from April 1999 until April 2003.  He was also Chairman of the Nominations and Board Affairs Committee from April 1997 until April 2003.  Jones is also the Co-Founder, Chairman, and CEO of Humana Inc.

33.     Defendant Jeffrey M. Leiden, M.D., Ph.D. ("Leiden") was a director of Abbott since April 1999 and was President and COO from 1987 until 2000 and a member of the Audit and Public Policy Committees from April 1999 until his retirement.

34.     Defendant The Rt. Hon. Lord David Owen CH ("Owen") served as a director of the Company from 1996 until his retirement in April 2011.  During his time at the Company, Owen served on the Nominations Committee until April 1996; the Audit Committee from April 1997 until April 2011; the Nominations and Board Affairs Committee from April 1997 until April 2002; and the Nominations and Governance Committee from April 2003 until April 2011.

35.     Defendant Robert L. Parkinson, Jr. ("Parkinson") was a director of Abbott from April 1998 until his retirement in January 2001.  While at Abbott, Parkinson served as President and COO since January 1999.

36.     Defendant Boone Powell, Jr. ("Powell") served as a director of the Company from 1985 until April 2009.  During his time at the Company, Powell was a member of: the Nominations Committee until April 1996; the Audit Committee from April 1997 until April

2003; the Compensation Committee from April 1997 until April 2009; and the Public Policy Committee from April 2004 until April 2009.

37.     Defendant Addison Barry Rand ("Rand") was a director of Abbott since 1992 and served on the Compensation Committee until April 2004; the Nominations Committee until April 1996; the Nominations and Board Affairs Committee from April 1997 until April 2002; and the Nominations and Governance Committee from April 2003 until April 2004.  Rand also served on the board of Agilent Technologies, Inc. with Clark.

38.     Defendant W. Ann Reynolds, Ph.D. ("Reynolds") served as an Abbott director from 1980 until her retirement in April 2010.  During her time at the Company, Reynolds was Chairman of the Nominations Committee until April 1996; Chairman of the Audit Committee until April 1997; Chairman of the Public Policy Committee from April 2003 until April 2010; and a member of: the Nominations and Board Affairs Committee from April 1997 until April 2002; the Public Policy Committee from April 1999 until April 2010; and the Nominations and Governance Committee from April 2003 until April 2010.  Reynolds is also a director of Humana Inc., along with Austen.

39.     Defendant Roy S. Roberts ("Roberts") was a director of the Company from April 1998 until his retirement in April 2011.  Roberts served on the Nominations and Board Affairs Committee from April 1998 until April 2002; the Public Policy Committee from April 1999 until April 2010; and the Nominations and Governance Committee from April 2003 until April 2010. He was also Chair of the Public Policy Committee in April 2010.

40.     Defendant William D. Smithburg ("Smithburg") served as an Abbott director from 1982 until April 2011.  During his time at the Company, Smithburg was on the Compensation Committee from April 1997 until April 2010; the Public Policy Committee from

April 1999 until April 2009; and the Audit Committee from April 2004 until April 2010. Smithburg was also Chair of the Public Policy Committee from April 1999 until April 2002 and Chair of the Compensation Committee until April 1997 and then from April 2003 until April 2010.

41.     Defendant John R. Walter ("Walter") was a director of the Company from 1990 until September 2006. Walter served on the Audit Committee from April 1997 until April 2006 and the Public Policy Committee from April 2001 until April 2006.

42.     Defendant William L. Weiss ("Weiss") served as an Abbott director from 1984 until his retirement in April 2000. While at Abbott, Weiss was Chairman of the Board Affairs Committee until April 1996 and a member of the Compensation Committee until April 2000.

43.     The defendants referred to in paragraphs 25 through 42 are collectively referred to hereinafter as the "Former Director Defendants." The Current Director Defendants and Former Director Defendants are collectively referred to hereinafter as the "Director Defendants."

44.     Due to their positions as current or former officers and/or directors of Abbott, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its shareholders the fiduciary obligations of loyalty and due care. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders to benefit all shareholders equally, rather than to further their personal interests or other interests. Each director and officer of Abbott owes a fiduciary duty to the Company and its shareholders to exercise good faith and diligence in the administration of the affairs of the Company.

45.     To discharge their duties, the Director Defendants are required to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and

controls of the Company. By virtue of such duties, the Director Defendants were and are required to, among other things:

      a.     Manage, conduct, supervise, and direct the business affairs of Abbott in accordance with all applicable laws (including federal and state laws, government rules and regulations and the charter and bylaws of Abbott);

      b.     Ensure that relevant FDA regulations under which Abbott operated were followed, that violations thereof were timely corrected, and that regulatory inquiries, comments, and warnings were responded to in a timely and effective fashion;

      c.     Neither violate nor knowingly permit any officer, director or employee of Abbott to violate applicable laws, rules, and regulations;

      d.     Remain informed as to the status of Abbott's operations and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

      e.     Conduct reasonable investigations of relevant matters;

      f.     Establish and maintain systematic and accurate records and reports of the business and affairs of Abbott and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records; and

      g.     Maintain and implement an adequate, functioning system of internal controls, such that Abbott's affairs and operations would be conducted in accordance with all applicable laws, rules, and regulations.

46.    The Director Defendants, in light of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and indirectly, exercise control over the acts described herein.

47.    Each defendant herein is sued individually as a conspirator, aider, and abettor, as well as in his or her capacity as a present or past officer and/or director of Abbott, and the liability of each arises from the fact that each has engaged in all or part of the unlawful acts, schemes, procedures, or transactions described of herein.

## FACTUAL BACKGROUND

### FDA Approval of Depakote

48.    A drug manufacturer must receive FDA approval for a prescription drug before the drug manufacturer markets or sells it. *See* 21 U.S.C. §§ 331, 355. Pursuant to 21 U.S.C. § 355, drug manufacturers must file an application with the FDA, which the FDA subsequently reviews to determine whether the drug's intended uses are safe and effective.

49.    Under the Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301-397, and the Public Health Services Act ("PHSA"), 42 U.S.C. § 262 *et seq.*, drug manufacturers may not market or promote a drug for a use that the FDA has not approved. *See* 21 U.S.C. §§ 331; 42 U.S.C. §§ 262(a)(1), (b); 21 C.F.R. § 601.12. Physicians may prescribe a drug for non-FDA approved uses. However, drug manufacturers may not market or promote to physicians a drug for uses other than those approved by the FDA, as this would constitute off-label marketing or misbranding under the FDCA. 21 U.S.C. §§ 331, 352; *see also* 21 C.F.R. § 202.1.

50.    According to the FDA's website, Depakote was originally approved by the FDA in March 1983. To date, the drug has been approved for: (i) treatment of the manic episodes associated with bipolar disorder; (ii) monotherapy and adjunctive therapy in the treatment of

patients with complex partial seizures that occur either in isolation or in association with other types of seizures; (iii) sole and adjunctive therapy in the treatment of simple and complex absence seizures, and adjunctively in patients with multiple seizure types that include absence seizures; and (iv) prophylaxis of migraine headaches.

51.     According to the FDA's website, Depakote ER was originally approved by the FDA in August 2000, and to date, has been approved for the following: (i) acute treatment of manic or mixed episodes associated with bipolar disorder, with or without psychotic features; (ii) monotherapy and adjunctive therapy of complex partial seizures and simple and complex absence seizures; (iii) adjunctive therapy in patients with multiple seizure types that include absence seizures; and (iv) prophylaxis of migraine headaches.

52.     Moreover, according to the FDA's website, Depakote Sprinkle Capsules have been approved by the FDA for: (i) monotherapy and adjunctive therapy of complex partial seizures and simple and complex absence seizures; and (ii) adjunctive therapy in patients with multiple seizure types that include absence seizures.

53.     Although the Depakote drugs have been approved by the FDA for the uses discussed above, the drugs have serious potential side effects.  The labels that accompany the drugs, which are available on the FDA's website, warn of, *inter alia*, hepatotoxicity (or chemical-driven liver damage, including hepatic failure resulting in fatalities), pancreatitis (including life-threatening pancreatitis), teratogenic effects and other adverse effects in pregnant women, suicidal behavior and ideation, somnolence in the elderly, thrombocytopenia, hyperammonemia, hypothermia and multi-organ hypersensitivity reactions.

54.     Depakote, Depakote ER, and Depakote Sprinkle Capsules have not been approved for treatment of the following:

- Alzheimer's disease or dementia or their side effects;

- disorders or symptoms other than epileptic seizures in patients under the age of eighteen;

- disorders or symptoms in children under the age of ten;

- schizophrenia;

- attention deficit hyperactivity disorder ("ADHD");

- insomnia;

- mood disorder;

- narcotic drug withdrawal;

- post-stroke seizures; or

- other forms of epilepsy.

**Off-Label Marketing of Depakote**

55.   Beginning in or around 1998, the Director Defendants caused and/or allowed Abbott to knowingly engage in repeated and persistent violations of federal law prohibiting the marketing of Depakote for uses not approved by the FDA.  These actions will likely require Abbott to pay at least $1.3 billion to the United States government and twenty-four states, along with substantial costs associated with governmental investigations and negotiation of the settlement.

56.   According to the *qui tam* Amended Complaint, Abbott engaged in centrally-organized plans to illegally market Depakote.  Abbott promoted Depakote for non-FDA approved uses by employing numerous tactics, including, for example, concealing what appeared to be unbiased scientific and educational programs into avenues of promoting Depakote, and

providing incentives to physicians (monetary and otherwise) to encourage them to promote and prescribe Depakote for non-FDA approved uses.

57.     Abbott targeted its off-label marketing towards elderly patients suffering from Alzheimer's disease or dementia.  Abbott focused its efforts on, *inter alia*, nursing homes, assisted living developments, and long term care facilities, forming a sales division devoted to marketing Depakote to physicians and other health care professionals within these markets.

58.     According to the *qui tam* Amended Complaint, in or around 1998, Abbott created the "Long Term Care" division,[2] devoted exclusively to marketing Depakote to long term care facilities for non-FDA approved uses.  To facilitate off-label marketing of Depakote to the geriatric markets, Abbott provided training, incentives, and compensation packages to its sales representatives, who would then market Depakote to physicians and institutions and encourage them to use Depakote in place of psychopharmacological drugs manufactured by other pharmaceutical companies.

59.     Abbott hired outside consultants to train its sales representatives to off-label market Depakote to geriatric markets, which training took place off of Abbott's headquarters. The Company also selected certain Company sales representatives to teach their off-label marketing skills to other sales representatives, and held mock sales meetings and calls.

60.     Abbott sales representatives were trained to use various off-label marketing techniques on physicians and other health care providers.  For example, sales representatives were instructed to: use Company-approved sales aids in long term or skilled nursing facilities; provide physicians with data from expert consensus guidelines regarding dementia; and attend

---

[2] The Long Term Care division was ultimately combined with several other divisions within the Company, which were collectively referred to as the Specialty Accounts division.

patient and caregiver support group meetings (including those sponsored by the Alzheimer's Association) that provided patients with information about types of treatments for dementia.

61. According to the *qui tam* Amended Complaint, Abbott also set aside significant resources for the Long Term Care division to educate physicians and other health care professionals about Depakote off-label uses. For example, Abbott representatives specially trained and provided written materials and presentations to health care professionals. Moreover, Abbott representatives, after securing advanced approval from Abbott's headquarters, provided substantial payments to physicians (through intermediaries) to promote Depakote off-label uses to other physicians at various programs and lectures, dinners, Continuing Medical Education classes ("CMEs"), and other events. Abbott also provided monetary and other incentives to physicians who prescribed large quantities of Depakote, and physicians who Abbott believed would promote or prescribe Depakote in the future. Additionally, Abbott purchased data to use to gather prescribing information about physicians practicing in long term care facilities.

62. Moreover, according to the *qui tam* Amended Complaint, Abbott's marketing department also paid for speaker events at large national meetings, such as one event in March 2003 hosted by AMDA (formerly the American Medical Directors Association), a professional association of medical directors, physicians, and others practicing in the long term care continuum, focusing primarily on Depakote off-label uses in nursing homes. Abbott also provided funding to entities to develop therapeutic guidelines and/or disease state management programs for treating symptoms associated with dementia.

63. Abbott funded and created expert consensus pocket guidelines for use by physicians and other practitioners regarding the protocol for symptoms associated with dementia. Moreover, Abbott trained and required the Company's representatives to use the guidelines to

recommend Depakote for treating symptoms associated with dementia, to educate physicians and practitioners regarding how to use Depakote to avoid Omnibus Budget Reconciliation Act[3] requirements, and to suggest Depakote dosages for elderly patients.

64. Targeting the elderly population placed these individuals at serious risk of injury, illness, and death, and also caused them financial harm. As mentioned above, Depakote's label specifically warns of the side effect of "somnolence in the elderly." Specifically, the Depakote label states, among other things, that "[a] higher percentage of patients above 65 years of age reported accidental injury, infection, pain, somnolence, and tremor[,]" and "[a] study of elderly patients with dementia revealed drug related somnolence and discontinuation for somnolence[.]"

65. According to the *qui tam* Amended Complaint, Abbott also marketed Depakote Sprinkle Capsules for administration to elderly patients through feeding tubes. While there is no FDA-approved dosage for administration of Depakote Sprinkle Capsules through feeding tubes, Abbott representatives were directed to represent to physicians, other healthcare providers, and pharmacists that the drug may be administered this way. The current "Administrative Guide" that accompanies the drug's label, which is available on the FDA's website, states:

> Depakote Sprinkle Capsules (divalproex sodium coated particles in capsules) may be swallowed whole or the capsule contents may be sprinkled onto soft food such as applesauce or pudding. . . .
>
> Place all the sprinkles onto a small amount (about a teaspoonful) of soft food such as applesauce or pudding.
>
> Make sure that all of the sprinkle and food mixture is swallowed right away. Do not chew the sprinkle and food mixture. . . .

66. Abbott representatives were instructed to use sales aids and instruction pamphlets to teach physicians and nurses how to correctly place the contents of Depakote Sprinkle Capsules

---

[3] Among other things, the Omnibus Budget Reconciliation Act of 1987 regulates the use of psychopharmacologic drugs in nursing homes.

into feeding tubes and to distribute these instruction pamphlets. Abbott representatives were encouraged to promote Depakote Sprinkle Capsules mainly for geriatric patients who suffered from symptoms of dementia and who could not or refused to swallow tablets. However, as mentioned, Depakote Sprinkle Capsules are FDA approved only for monotherapy and adjunctive therapy of complex partial seizures and simple and complex absence seizures, and adjunctive therapy in patients with multiple seizure types that include absence seizures. Abbott representatives were also trained and instructed to recommend that long term health care providers place the contents of Depakote Sprinkle Capsules into patients' foods, and focused on encouraging doctors to switch from another drug—valporate syrup, manufactured by other drug companies—to Depakote Sprinkle Capsules.

67. According to the *qui tam* Amended Complaint, Abbott representatives were also trained and directed to provide instructions for "rapid loading doses" of Depakote to treat certain instances of acute mania. Representatives used sales aids and other materials produced by Abbott to assist in promoting to physicians the "rapid load" dosage of Depakote, although the drug does not have dosing instructions for "rapid loading." Abbott also provided physicians with information on such dosages and paid at least one physician to produce a CME video on the topic. Representatives were also trained to encourage "rapid loading" of Depakote instead of using the drug Zyprexa (manufactured by another drug manufacturer) for individuals suffering from acute psychiatric symptoms, which is not an FDA-approved use of the drug.

68. The Company's sales force was also trained to provide instructions for Depakote "maintenance dosing" for symptoms associated with dementia, despite the lack of FDA approval for this dosage or disease. Sales representatives were trained to suggest to physicians high doses

69.     According to the *qui tam* Amended Complaint, Abbott also off-label marketed Depakote for the treatment of a number of other diseases and illnesses.  For example, Abbott marketed Depakote to treat developmental delay, behavior problems, psychiatric disorders, and ADHD in children under the age of eighteen.  Depakote has only been approved for treatment of *epilepsy* in children ten years of age or older, and has not been approved for treatment of developmental delay, behavior problems, psychiatric disorders, or ADHD in children. Nevertheless, in violation of applicable law, Abbott sales representatives were trained and instructed to promote Depakote for off-label use at mental health facilities that did not treat children with epilepsy, but instead treated children for developmental delay, behavior problems, psychiatric disorders, and ADHD.

70.     Abbott masked off-label marketing of Depakote for unapproved uses in children by, for example, focusing on incidences of epilepsy that occur in children who have developmental problems, and focusing on symptoms that may be present in both children with epilepsy and developmental problems.  Abbott also sought physicians or experts to promote Depakote for developmental delay.

71.     According to the *qui tam* Amended Complaint, Abbott off-label marketed Depakote for the treatment of depression associated with bipolar disorder in children and adults. As discussed above, Depakote has been approved by the FDA for treatment of only *manic* episodes associated with bipolar disorder, and Depakote ER has been approved for acute treatment of manic or mixed episodes associated with bipolar disorder.  However, neither has

been approved for the treatment of bipolar depression or for treatment of bipolar disorder in children.

72.     Abbott representatives promoted Depakote for these off-label uses and encouraged its use over drugs manufactured by other companies, such as Lamictal, which is used for the long-term treatment of bipolar I disorder.  Abbott paid physicians to provide lectures to other physicians about bipolar depression and/or prescribing Depakote for treatment of bipolar depression.  Abbott representatives were trained to market the drug for treatment of bipolar depression.  They were taught to focus on the negative side effects of drugs such as Lamictal, and were taught how to respond to objections from psychiatrists regarding prescribing Depakote for treating children with bipolar disorder.  Abbott representatives were also instructed to use only certain information from studies to discredit trials referenced in Lamictal's sales aids, and to provide materials produced by Abbott that discussed Depakote off-label uses in children.

73.     According to the *qui tam* Amended Complaint, Abbott also marketed Depakote for the treatment of schizophrenia and other psychological disorders, which are not FDA approved uses of the drug.  Company sales representatives were directed to use Abbott sales aids and studies to market Depakote for the treatment of psychosis or schizophrenia.

74.     Moreover, according to the *qui tam* Amended Complaint, Abbott off-label marketed Depakote for treatment of, *inter alia*, post-seizure stroke, epilepsy in children under the age of ten, and addictive narcotic drug withdrawal.  For example, Abbott funded events where Abbott-paid physicians promoted the use of Depakote to treat symptoms of narcotic drug withdrawal, and created materials on this non-FDA approved use that were distributed to, among others, physicians paid to lecture on the off-label uses.  Abbott also misrepresented that Depakote lowered cholesterol.  Abbott sales representatives were instructed to inform physicians

that the drug had a "metabolically neutral" side effect, when in fact Abbott's data indicated that Depakote lowered not only LDL cholesterol (the "bad" cholesterol), but also HDL cholesterol (the "good" cholesterol). Representatives used Abbott sponsored CME and study materials and sales aids to misrepresent this effect of Depakote.

75.     Beginning in 2007, several *qui tam* actions were filed against Abbott in connection with the Company's off-label marketing of Depakote, which were ultimately consolidated in the United States District Court for the Western District of Virginia.

76.     Meredith McCoy, who was employed by Abbott as a pharmaceutical sales representative from February 1998 until June 2007 and who specifically promoted Depakote during that period, filed a complaint against Abbott on October 31, 2007, and subsequently filed the *qui tam* Amended Complaint on behalf of the United States of America, twenty-four states, the District of Columbia, and Chicago. In the *qui tam* Amended Complaint, plaintiffs alleged that Abbott (and several other defendants, whose names have not been publicly released) violated the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and similar state and municipal laws in connection with, among other things, off-label marketing of Depakote. Specifically, the *qui tam* Amended Complaint alleged:

> [Abbott] knowingly presented or caused to be presented false or fraudulent claims to be submitted in violation of the law for payment or approval by federal and state agencies and/or programs by:
>
> - systematically engaging in illegal off-label marketing of Abbott's anti-epileptic drug, Depakote (generic name divalproex sodium);
>
> - furthering the unlawful off-label marketing of Depakote through the transformation of ostensibly independent and unbiased educational and scientific programs, including physician continuing medical education ("CME") programs, into promotional vehicles for Depakote; and

- unlawfully promoting Depakote in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), as amended by the Patient Protection and Affordable Care Act ("PPACA"), Public Law No. 111-148, Sec. 6402(g), and the Stark Law, 42 U.S.C. § 1395nn, and 42 C.F.R. § 411.350 *et seq.* by providing cash and other incentives to induce doctors to promote and prescribe Depakote, including for off-label uses.

77.     The *qui tam* Amended Complaint further alleged:

A substantial portion of Depakote prescriptions are paid for by Medicare, Medicaid and other government-funded health insurance programs. Prescriptions for uses other than those that are approved by the FDA or included in certain government-approved compendia are not reimbursable.

The complaint alleged that these programs were harmed because, among other things, they paid for off-label prescriptions, were required to pay for treating negative side effects in patients who were prescribed Depakote, and health care providers submitted false claims to be paid by the programs.

78.     Moreover, the United States Department of Justice embarked on a civil and criminal investigation of Abbott, specifically in connection with its off-label marketing of Depakote.

79.     On at least one occasion, on January 22, 2009, the Division of Drug Marketing, Advertising, and Communications ("DDMAC") of the FDA sent a letter (the "Warning Letter") to Rick Leber, Regulatory Manager at Abbott, in connection with a specific marketing material, referred to therein as a Depakote ER/Depakote Continuum Care Pharmacy Formulary Flashcard for Depakote (the "Flashcard"). The Warning Letter stated, among other things, that "[t]he Flashcard is misleading because it . . . broadens the indication of Depakote ER[.] . . . Thus*, this promotional material misbrands the drugs in violation of the Federal Food, Drug, and Cosmetic Act* (the Act), 21 U.S.C. 352(a) and 321(n)." (Emphasis added). The Warning Letter further stated that "[t]he Flashcard is misleading because it *implies that Depakote ER is indicated for use*

*in a broader range of mania patients than Depakote, when this is not the case*." (Emphasis added).  The Warning Letter continued: "Additionally, we note that the Flashcard fails to include specific indications for Depakote."  In the Warning Letter, "DDMAC request[ed] that Abbott immediately cease the dissemination of violative promotional materials for Depakote and Depakote ER such as those described above."

80.    On March 15, 2010, Abbott filed a Form DEF 14A with the SEC, which disclosed: "In accordance with Abbott's articles of incorporation, *Abbott has advanced defense costs on behalf of three former officers in connection with the United States Department of Justice's criminal and civil investigation of Abbott's Depakote sales and marketing activities*." (Emphasis added).

81.    Moreover, according to a Form DEF 14A filed by Abbott with the SEC on March 15, 2011:

> In accordance with Abbott's articles of incorporation, *Abbott has advanced defense costs on behalf of two current and five former officers in connection with the United States Department of Justice's criminal and civil investigation of Abbott's Depakote sales and marketing activities.* Abbott has advanced defense costs on behalf of a current officer in connection with AMO [Advanced Medical Optics, Inc., a subsidiary of Abbott].

(Emphasis added).

82.    On October 19, 2011, Abbott filed a Form 8-K with the SEC attaching as an exhibit a press release issued that day announcing Abbott's financial results for the third quarter ended September 30, 2011.  The press release reflected that the Company reserved $1.5 billion "related to ongoing settlement discussions in the previously disclosed investigation by the U.S. Department of Justice, through the U.S. Attorney for the Western District of Virginia, related to Depakote."  The press release also indicated that "[t]he discussions are ongoing, and until concluded, there can be no certainty about definitive resolution."

83.     Due to the off-label marketing of Depakote, Abbott has tentatively agreed to pay at least $1.3 billion to settle claims by the United States government and twenty-four states.  The tentative agreement reached among Abbott executives, federal prosecutors, and state officials will require Abbott to pay approximately $800 million to resolve civil claims and approximately $500 million in criminal penalties.

84.     A settlement of $1.3 billion would be the third largest settlement for illegal pharmaceutical marketing in United States history, behind $2.3 billion and $1.4 billion as being the first and second largest, respectively.

**The Wrongful Conduct Reached – And Benefitted – The Highest Levels of the Company**

85.     According to the *qui tam* Amended Complaint, the illegal and wrongful actions alleged above were orchestrated and condoned by the highest levels of Abbott's management, some of whom benefitted handsomely.  The unlawful acts benefited top Abbott managers, as the Company's revenue growth resulting from the illegal marketing schemes enabled the highest levels of Abbott management to obtain disproportionately large compensation packages, and boosting sales through off-label marketing directly translated, and continue to translate, into higher bonuses for Abbott's top executives.

86.     As a result of the Company's off-label marketing of Depakote, sales reached more than $1.4 billion per year.  Between 2000 and 2009, sales of Depakote in the United States were at least $6.8 billion, and a substantial portion of these sales was the result of Abbott's unlawful off-label marketing.

87.     Moreover, as off-label marketing increased, top executives' compensation reached new heights.  For example, according to proxy statements filed by the Company, former

CEO Burnham's salary was $794,269[4] in 1994, $818,269 in 1995, $846,923 in 1996, $877,769 in 1997, and $913,077 in 1998.[5]  Burnham's bonus was $800,000 for 1994, $1,000,000 for 1995, $1,055,000 for 1996, $1,175,000 for 1997, and $1,500,000 for 1998.  His "other annual compensation" was $207,556 in 1994, $413,422 in 1995, $518,747 in 1996, $593,916 in 1997, and $819,205 in 1998.

88.     According to proxy statements filed by the Company, after White assumed the role of CEO in 1998, his salary was: $1,306,731 in 1999, $1,390,961 in 2000, $1,445,662 in 2001, $1,497,388 in 2002, $1,564,961 in 2003, $1,551,846 in 2004, $1,605,990 in 2005, $1,661,973 in 2006, $1,726,936 in 2007, $1,807,500 in 2008, $1,852,319 in 2009, and $1,893,371 in 2010.

89.     White's bonus was $800,000 for 1999, $1,800,000 for 2000, $2,100,000 for 2001, $1,250,000 for 2002, $1,750,000 for 2003, $2,700,000 for 2004, and $2,650,000 for 2005.  He was awarded a Performance Incentive Plan ("PIP") bonus of $4,050,000 for 2006, $4,050,000 for 2007, $4,200,000 for 2008, $3,900,000 for 2009, and received a bonus of $3,700,000 for 2010.

90.     White's "other annual compensation" was $40,662 in 1999, $68,881 in 2000, $104,247 in 2001, $66,068 in 2002, $84,122 in 2003, 487,817 in 2004, and $439,387 in 2005.  "All other compensation" for White was $855,233 in 2006, $1,048,661 in 2007, $850,893 in 2008, $709,770 in 2009, and $807,728 in 2010.

---

[4] These figures exclude long-term compensation, such as stock awards and option awards.

[5] Burnham retired from the role of CEO at the end of 1998.

91.     According to the *qui tam* Amended Complaint, among other things, the Long Term Care division was created and/or maintained with the knowledge and consent of Abbott management, including an undisclosed member of management.[6]

92.     According to the *qui tam* Amended Complaint, Abbott upper level management attended Depakote sales training sessions but purposefully left the room when the off-label training sessions began, and while a sales representative was told by her managers that Abbott upper level management knew about off-label training sessions, they did not want to personally witness them.

93.     According to the *qui tam* Amended Complaint, management staff at Abbott's corporate headquarters were fully aware of Depakote's speaker programs and events that the Company underwrote financially.  Abbott required Long Term Care/Special Accounts division representatives to secure advanced approval from Abbott headquarters for payments for the events and payments to physicians.

94.     Upon information and belief, the magnitude and duration of the wrongdoing, coupled with the Company's billions of dollars of sales revenue attributable to sales of Depakote in the United States (a substantial portion of which were the result of off-label marketing) reflect the Director Defendants' participation and/or approval of the wrongful conduct alleged herein, and/or reckless disregard of their fiduciary duties to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and controls of the Company.

95.     Indeed, the Director Defendants' sustained action and/or failure to act to protect the Company in the face of systematic violations of applicable law resulting from the off-label

---

[6] The *qui tam* Amended Complaint was filed under seal pursuant to 31 U.S.C. § 3730(b)(2), and certain individuals' names have been redacted from the public version, including this member of management.

marketing of Depakote has resulted in what is to be the *third largest settlement* for illegal

pharmaceutical marketing in United States history.

96.    According to the Company's most recent Definitive Proxy Statement filed on

Form DEF 14A with the SEC on March 15, 2011:

> The board has risk oversight responsibility for Abbott and administers this
> responsibility both directly and with assistance from its committees. The board
> has determined that the current leadership structure, in which the offices of
> chairman and chief executive officer are held by one individual and an
> independent director acts as lead director, ensures the appropriate level of
> oversight, independence, and responsibility is applied to all board decisions,
> including risk oversight, and is in the best interests of Abbott and its shareholders.
> The chairman of the nominations and governance committee acts as the lead
> director to facilitate communication with the board and presides over regularly
> conducted executive sessions of the independent directors or sessions where the
> chairman of the board is not present. It is the role of the lead director to review
> and approve matters, such as agenda items, schedule sufficiency, and, where
> appropriate, information provided to other board members. The lead director is
> chosen by and from the independent members of the board of directors, and
> serves as the liaison between the chairman and the independent directors;
> however, all directors are encouraged to, and in fact do, consult with the chairman
> on each of the above topics as well. The lead director, and each of the other
> directors, communicates regularly with the chairman and chief executive officer
> regarding appropriate agenda topics and other board related matters.

The Company's previous proxy statements have similar explanations of the Board's oversight

responsibility.

97.    According to Abbott's proxy statements, the Board met officially eight times in

1998, ten times in 1999, six times in 2000, six times in 2001, eight times in 2002, eleven times in

2003, eight times in 2004, eight times in 2005, thirteen times in 2006, seven times in 2007, nine

times in 2008, seven times in 2009, and seven times in 2010.

98.    As a matter of corporate governance in connection with Board meetings, senior

officers of Abbott and/or members of the Company's committees prepared packages of relevant

information concerning the business and financial position of the Company, including internal

audit reports that detailed the functions of critical departments of the Company, litigation reports detailing pending or possible litigation or regulatory actions concerning the Company. The Director Defendants, under existing principles of corporate law and governance, had the responsibility to ensure that Abbott had in place a reporting system that would enable them to determine if Abbott's activities complied with applicable law and whether proper reports were being generated.

99.     Abbott currently has, and for substantially the duration of the relevant period had, five committees: the Public Policy Committee, Audit Committee, Executive Committee, Compensation Committee, and Nominations and Board Affairs Committee.

100.    According to the Company's Public Policy Committee charter:

*Purpose.* The Public Policy Committee of the Board of Directors **shall assist the Board in fulfilling its oversight responsibility with respect to**: public policy, regulatory (including **regulation by the Federal Food and Drug Administration**, as well as other domestic, foreign and international regulatory bodies) and government affairs **and healthcare compliance issues that affect Abbott** (recognizing that other board committees assist the Board of Directors in reviewing certain areas of legal and regulatory compliance), by discharging the responsibilities set forth below. . . .

*Authority and Responsibilities.* To assist it in the conduct of its responsibilities, the Public Policy Committee shall consult with management and, to the extent it deems it necessary or appropriate, may seek advice and assistance from Abbott employees or others, and may retain legal counsel and other advisors.

The Public Policy Committee shall report to the Board on a regular basis.

The Public Policy Committee may delegate any of its responsibilities and duties to one or more members of the Public Policy Committee.

The Committee shall:

•       **Review and evaluate Abbott's policies and practices with respect to maintaining legal, regulatory and healthcare compliance** (recognizing that other board committees assist the Board of Directors in reviewing certain areas of legal and regulatory compliance), and review them with the Board as appropriate.

- Devise a process for the dissemination of information to the Committee from management with respect to regulatory and healthcare compliance matters, including, as appropriate, presentations to the Committee from management concerning the state of regulatory compliance and all issues with respect thereto.

- The Chief Ethics and Compliance Officer shall report to the Public Policy Committee on an as needed basis on any significant compliance issues.

- Review and evaluate Abbott's policies and practices with respect to social responsibility, and review them with the Board as appropriate.

- Review social, political, economic and environmental trends and public policy issues that affect or could affect Abbott's business activities, performance, and public image, and review them with the Board as appropriate.

- Review and make recommendations to the Board regarding shareholder proposals submitted for inclusion in Abbott's proxy materials that relate to public policy or social responsibility issues.

(Emphasis added).

101.     According to the Company's proxy statements, the Public Policy Committee—which was created in October 1999, includes certain of the Director Defendants, and was charged with assisting the Board in fulfilling its oversight responsibility with respect to, among other things, legal, regulatory, and healthcare compliance (including regulation by the FDA)—officially met three times in 2000, three times in 2001, three times in 2002, two times in 2003, two times in 2004, two times in 2005, one time in 2006, two times in 2007, once in 2008, two times in 2009, and once in 2010.

102.     Moreover, according to Abbott's Audit Committee charter:

*Purpose.* The Audit Committee of the Board of Directors shall assist the Board in fulfilling its oversight responsibility with respect to:

- Abbott's accounting and financial reporting practices and the audit process;

- the quality and integrity of Abbott's financial statements;

- the independent auditors' qualifications, independence, and performance;

- the performance of Abbott's internal audit function and internal auditors;

- legal and regulatory compliance as it relates to financial matters, including accounting, auditing, financial reporting, and securities law issues (recognizing that other board committees assist the Board of Directors in reviewing other areas of legal and regulatory compliance); and

- Abbott's ***enterprise risk management, including major financial risk exposures*** (recognizing that other board committees assist the Board of Directors in reviewing certain aspects of risk management);

and shall prepare the report required by the rules of the Securities and Exchange Commission to be included in Abbott's annual proxy statement. . . .

(Emphasis added). Among other things, the Audit Committee was required to:

Review and discuss (with management, the internal auditors and the independent auditors, as appropriate) Abbott's enterprise risk management, including major financial risk exposures, and the steps management has taken to monitor and control those exposures, including Abbott's risk assessment and risk management policies.

103. The Audit Committee, which includes certain of the Director Defendants and assists the Board in fulfilling its oversight responsibilities and with certain areas of legal and regulatory compliance, met officially two times in 1998, two times in 1999, three times in 2000, four times in 2001, seven times in 2002, seven times in 2003, seven times in 2005, seven times in 2006, six times in 2007, seven times in 2008, seven times in 2009, and seven times in 2010.

104. Moreover, Abbott's Executive Committee, which may exercise all the authority of the Board in the management of Abbott, except for matters expressly reserved by law for Board action, met once in 2003, three times in 2006, once in 2008, and three times in 2010.

105. The Company's Compensation Committee, which assists the Board in carrying out its responsibilities relating to the compensation of Abbott's executive officers and directors,

met officially three times in 1998, two times in 1999, two times in 2000, two times in 2001, three times in 2002, four times in 2003, eight times in 2004, two times in 2005, three times in 2006, three times in 2007, four times in 2008, three times in 2009, and five times in 2010.

106.    The Nominations and Board Affairs Committee—which assists the Board in identifying individuals qualified to become Board members and recommends to the Board the nominees for election as directors at the next annual meeting of shareholders, recommends to the Board the persons to be elected as executive officers of Abbott, develops and recommends to the Board the corporate governance guidelines applicable to Abbott, and serves in an advisory capacity to the Board and the Chairman of the Board on matters of organization, management succession plans, major changes in the organizational structure of Abbott, and the conduct of Board activities—officially met three times in 1998, two times in 1999, two times in 2000, two times in 2001, three times in 2002, two times in 2003, two times in 2004, four times in 2005, six times in 2006, two times in 2007, three times in 2008, two times in 2009, and twice in 2010.

107.    The Director Defendants (for the years in which they were directors) signed Abbott's Forms 10-K filed with the SEC each year during the relevant period and, in so doing, were required to assure themselves, through their due diligence of the matters discussed therein and of Abbott's business, operations, and finances, that the Forms 10-K filed with the SEC were accurate.  Through this process the Director Defendants were required to make themselves aware of Abbott's regulatory status and exposure, including the continuing practices of off-label marketing of Depakote.  For example, the Company's most recent Form 10-K, filed on February 18, 2011, discusses the following items, each of which the Director Defendants who were directors at that time, by signing the Form 10-K, presumably investigated to assure themselves that the descriptions were accurate:

**Regulation**: *The development, manufacture, sale, and distribution of Abbott's products are subject to comprehensive government regulation.* Government regulation by various federal, state, and local agencies, both domestic and international, which includes detailed inspection of, and controls over, research and laboratory procedures, clinical investigations, product approvals and manufacturing, *marketing and promotion*, sampling, distribution, record keeping, storage, and disposal practices, and achieving compliance with these regulations, substantially increases the time, difficulty, and costs incurred in obtaining and maintaining the approval to market newly developed and existing products. *Government regulatory actions can result in* delay in the release of products, seizure or recall of products, suspension or revocation of the authority necessary for their production and sale, and other *civil or criminal sanctions, including fines and penalties*. . . .

*Abbott's products are subject to rigorous regulation by the U.S. Food and Drug Administration, and numerous international, supranational, federal, and state authorities*. . . .

*Abbott's industry is also subject to various federal, state, and international laws and regulations pertaining to government benefit program reimbursement, price reporting and regulation, and health care fraud and abuse, including anti-kickback and false claims laws, the Medicaid Rebate Statute, the Veterans Health Care Act, and individual state laws relating to pricing and sales and marketing practices. Violations of these laws may be punishable by criminal and/or civil* sanctions, including, in some instances, substantial fines, imprisonment, and exclusion from participation in federal and state health care programs, including Medicare, Medicaid, and Veterans Administration health programs. These laws and regulations are broad in scope and they are subject to evolving interpretations, which could require Abbott to incur substantial costs associated with compliance or to alter one or more of its sales or marketing practices. In addition, violations of these laws, or allegations of such violations, could disrupt Abbott's business and result in a material adverse effect on Abbott's revenues, profitability, and financial condition.

(Emphasis added). This Form 10-K was signed White, Alpern, Austin, Farrell, Fuller, Liddy, Novakovic, Osborn, Owen, Roberts, Scott, Smithburg, and Tilton, as well as Executive Vice President, Finance and Chief Financial Officer Thomas C. Freyman, and Vice President and Controller Greg W. Linder.

108. Additional Forms 10-K filed during the relevant period contain paragraphs similar to those above, and were signed by the Director Defendants who served at the time.

## DERIVATIVE ALLEGATIONS

109.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

110.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered by the Company because of the breaches of fiduciary duties by the Director Defendants.

111.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights, and has retained counsel experienced in litigating actions of this type.

112.     Plaintiff is an owner of Abbott shares and was an owner of Abbott stock during all times relevant to the Director Defendants' wrongful conduct as alleged herein.

## DEMAND IS EXCUSED

113.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

114.     Abbott is incorporated in Illinois, and, thus, Illinois corporation law governs the issue of whether Plaintiff was required to make a demand on the Company's Board to institute this case before filing this Complaint.  Making a demand is considered futile under Illinois law if particularized facts raise a reasonable doubt that either (1) the directors are disinterested or independent, or (2) the challenged transaction was the product of a valid exercise of the directors' business judgment.

115.     Plaintiff has not made any demand on the Abbott Board to institute an action against itself for their breaches of fiduciary duties as alleged herein because such demand would be a futile and useless act for the following reasons:

(a)    The facts detailed above demonstrate and are the basis for the allegations that the Director Defendants: caused and/or allowed Abbott to knowingly engage in repeated and persistent violations of federal regulations in connection with the off-label marketing of Depakote; knew that the failure to comply with regulations would result in severe penalties; and chose not to bring a prompt halt to the improper conduct causing the non-compliance, reprimand those persons involved, or seek to redress Abbott for the serious damages it has and will sustain;

(b)    The magnitude and duration of the wrongdoing, as alleged herein, and the magnitude of the proposed $1.3 billion settlement, reflect a lack of good faith on the part of the Director Defendants; and

(c)    The Board, by its actions and inactions, knowingly breached its fiduciary duties to Abbott and its shareholders.

116.    Demand is also excused as futile because the facts pled herein raise a reasonable doubt that a majority of the Board is independent and disinterested.  Upon information and belief, a majority of the Board members who would have reviewed the demand were directors who had been Board members during a portion and/or all of the period in question, and, thus, face a substantial likelihood of liability for deliberately and consciously failing to comply with their fiduciary duties.

## COUNT I

## BREACH OF FIDUCIARY DUTIES AGAINST THE DIRECTOR DEFENDANTS

117. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

118. Each of the Director Defendants, because of his or her positions as directors and/or officers of Abbott, owed fiduciary duties to the Company and its shareholders in connection with the management and operations of the Company's business and operations.

119. To properly discharge these duties, the Director Defendants were required to, among other things:

a. manage, conduct, supervise, and direct the business affairs of Abbott in accordance with best practices, and applicable state and federal laws, rules, and regulations;

b. neither violate nor permit any officer, director, agent, or employee of Abbott to violate applicable state and federal laws, rules, or regulations; and

c. remain informed as to the status of Abbott's business practices and operations and upon receipt of notice of information of imprudent or unsound practices or operations, make a reasonable inquiry in connection therewith, and take steps to correct such practices or operations.

120. Moreover, each of the Director Defendants had a duty to Abbott and its shareholders to establish and maintain adequate internal controls to ensure that the Company was operated in a prudent and lawful manner. The Director Defendants had an affirmative obligation to install an internal control system to discover wrongdoing. Additionally, where red flags exist, the Director Defendants have an obligation to take affirmative steps to address such issues.

121.     As detailed herein, the Director Defendants caused and/or allowed the Company to violate federal regulations and/or failed to properly and adequately maintain a system of internal controls adequate to insure the Company's compliance with, among other things, federal regulations, in violation of their fiduciary duties. The Director Defendants instituted a corporate culture that encouraged unlawful and irresponsible activity resulting in the likely loss of $1.3 billion or more.

122.     As a result of the Director Defendants' wrongful conduct and actions, Abbott has suffered and will continue to suffer significant damage.

123.     All of the Director Defendants, individually and in concert, engaged in the aforementioned conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company and conspired to, and did, abuse the control vested in them by virtue of their high-level positions in the Company.

124.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, Abbott engaged in unlawful activities causing damage to the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.     Authorizing the maintenance of this action as a derivative action, with Plaintiff as derivative plaintiff;

B.     Declaring that the Director Defendants have violated their fiduciary duties to the Company;

C.  Awarding against all of the Director Defendants and in favor of the Company the amount of damages sustained by the Company as a result of the Director Defendants' breaches of fiduciary duties;

D.  Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.  Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all claims asserted herein.

Dated: November 8, 2011

**KRISLOV & ASSOCIATES, LTD.**

By:  **/S/ Clint Krislov**
Clinton A Krislov
Civic Opera Building, Suite 1350
20 North Wacker Drive
Chicago, IL 60606
Tel.: (312) 606-0500
Fax: (312) 606-0207

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
Gina M. Serra
919 N. Market Street, Suite 980
Wilmington, DE 19801
Tel.: (302) 295-5310
Fax: (302) 654-7530

*Attorneys for Plaintiff*